' LOTTINGER, Judge.
This is a suit for damages for persona! and property damages resulting from a motor vehicle accident. Suit is against the liability insurer of Dewey Miller, d/b/a Dewey Miller Contracting Company. Trial was before a jury, and judgment was awarded petitioner in the sum of $19,390. Defendant has appealed.
The injuries and damages resulted when a vehicle insured by. defendant ran into the rear- of petitioner’s tractor and trailer. The facts, which are admitted, show that on the morning of August. 17, 1953, petitioner was driving his tractor on U. S. Highway 90 just east of Broussard, Louisiana. The tractor was towing a trailer with a cow in it. As petitioner was rounding a curve in the highway, a truck, operated by defendant’s assured, ran into the rear of the tractor and trailer, breaking the tractor in two, knocking petitioner to the floor, and twisting the steering wheel into his stomach so that he was pinned to the large back wheel of the tractor. As the tractor rolled to a stop, the knobs on the wheel ground into petitioner’s back. Petitioner was pinned between the rear wheel of the tractor and the steering wheel and was groaning and hollering with pain. It took some time for witnesses to release petitioner. A priest came by and administered the last rites of the Church to petitioner.
Petitioner was taken, by ambulance, to Our Lady of Lourdes Hospital. His back was cleaned, and he was bandaged from his left shoulder to his right hip. He was then *665 taken to a room and laid in bed. Every two hours, for five or six days, he was •given sedatives that helped, but did not wholly relieve the pain. For four or five ■days he lay flat on his back, motionless except for his head. He was fed intravenously, tubes were inserted to relieve his bladder, and tubes were inserted to relieve gas pains.
After leaving the hospital, petitioner went home and remained in bed for a couple of days. He was then able to get about with the aid of a cane or a member of his family. His first trip out was to attend a meeting of the School Board, but it was necessary for his daughter to help him up •the steps. He was driven to see the doctor •every three or four days to have his band•ages changed because “they stank so much.” After about three months petitioner was able to drive his car and get about without •a cane. Petitioner still complains of constant pain in the lower part of his back and claims that he cannot stoop like he used to do. If he tries to lift anything, he complains of great pain in his back. Changes •in the weather affect and pain him.
The facts show that petitioner was a •very active man prior to the accident. He ran a farm and dairy, as well as a grocery ■store. He liked to hunt. He was a member of several civic organizations, and was .a leading civic activity resident of Brous-sard. He was a Captain in the Volunteer .Fire Department, was head of the Church Fair, and was a member of the Lafayette Parish School Board. Since the accident 'he has been forced to practically retire from his community activities.
The defendant admitted liability for the ■damages'and injuries caused petitioner as a result of the accident. The liability limits under the insurance policy was $50,000-$100,000 for bodily injury aifd $25,000 for property damage.
The jury awarded a verdict in favor of petitioner and awarded damages in the sum of $19,390. The defendant has taken an ■appeal.
The first doctor to treat petitioner after the accident was Dr. Donald B. Williams, a surgeon of Lafayette, Louisiana. He testified that on August 17, 1953, the petitioner was in mild shock, and showed considerable tenderness over the left chest and lower abdomen, with severe contusions and abrasions of the entire posterior chest. The skin had been torn from a large area, and petitioner had a fracture of the ninth left rib. For a period of 72 hours the patient had a considerable ileus, which was explained as being “a condition in which the intestines are not doing or carrying on their normal functions, in which gas fluids collect in the intestines.” For three or four days tubes were inserted to relieve this condition, and petitioner was fed by infusion and given sedation for pain. Dr. Wil.liams further testified that the petitioner developed a mass in the anterior abdominal wall which he could diagnose only as hemorrhage, probably caused by pressure that caved in the forward part of the abdomen to the pelvis. The mass was about half the size of a fist. Later in his testimony, Dr. Williams testified that X-rays showed fracture of the eighth and ninth, left rib.
Dr. Williams stated that petitioner further complained of “pain in the low back, especially on the right side” and he was “placed on a rigid bed which is one of the methods we. use for treating acute back pain when he was still in the hospital.”
After his discharge from the hospital, Dr. Williams saw the petitioner nine times through January 18, 1954. Dr. Williams’ final diagnosis was as follows:
“Anteriorly, the compressing force struck the right lower quadrant of his abdomen causing hemorrhage into the anterior abdominal wall and probably retroperitoneal and intraperitoneal hemorrhage. Posteriorly, the compressing force at the upper margin of the right sacro ilial joint where the patient now complains of pain. It is probable that there was tearing and hemorrhage around the many ligaments and fascial attachments in this *666 area. The patient complained of pain in this area from the start, even though he had very painful injuries to the abdomen and posterior chest which seemed more severe at the time.
“The pain and disability the patient complains of is a compatible residual of the type of injury he sustained. This-may or may not improve with the . passage of time.”
At the suggestion of Dr. Williams, the petitioner consulted Dr. Meuleman, an orthopedic surgeon of Lafayette, on September 28, 1953, and subsequently in October, 1953, January, 1954, and March, 1955. From his examinations and X-rays, Dr. Meuleman could find no objective evidence to substantiate the patient’s complaints. He admitted, however, that “torn ligaments or muscles or things like that wouldn’t be viewed on X-rays.” Dr. Meuleman felt that petitioner had received “a pretty good beating up” and that there had been hemorrhage of the muscles from which scar tissues might result. He stated that there remained no objective symptoms, but that petitioner’s complaints had been' consistent and that pain was subjective. Dr. Meule-man testified that petitioner’s chief complaint was pain in the lower back, and that he did have a limp on the right leg.
The patient was also examined, by Dr. Wickstrom, the orthopedist in charge of Charity Hospital in New Orleans, and Chairman of the Department of Orthopedic Surgery of Tulane University. Dr. Wick-strom examined petitioner twice, first on October 17, 1953, and later in May, 1955.
Dr. Wickstrom’s opinion of the first examination was as follows:
“I felt, after the first examination, I felt that this man, of course it was very recent, about six or eight weeks after the injury, I gave a guarded prognosis. I stated that the patient had received abrasions of the back, contusions of the abdomen and chest with a fracture of the rib cage on the left and a fracture of transverse process of the fifth lumbar vertebra on the right. At that time the patient — I felt that the patient should abstain from lifting and was unable to perform any type of heavy work. I felt that he would be greatly benefited by the use of a wide lumbo sacral support to protect motion in the lumbar area. Eventual prognosis was quite good and I could not feel that this patient would have residual damage as a result of this accident. That was in October of 1953.”
After his examination of May, 1955, Dr. Wickstrom was of the opinion as follows:
“I was of the opinion, that he had some residual disability which I didn’t expect at the time of the first examination. I felt at the time of the second examination that he had a marked decline or deterioration of the body mechanism, whatever you want to. call it, the general body mechanics, slouching, stated that the slouch was because he hurt; he felt better bent forward a little bit.' I felt that he had certain findings which explained his complaints of pain; one was consistent poor posture; second, he constantly localized the pain over the area that he had before and had some persistent muscle spasm.
“Now taking the muscle spasm you could feel a tension in the muscles when the patient would shift his weight on the feet. That was not constant; it would occur and then re-occur. I felt that the history that he was in pain when it was aggravated by forward bending was legitimate, as I had found that at the time of our first ex-animation. I felt that he should definitely have a lumbo sacral support. I would like to take him and put him on a series of postural exercises. I would say that his disability would amount to about 20 percent of the body as a whole, based on the fact that I felt that he was not able to do lifting; although he was able to bend, he had some motion not quite up to normal, about 75 percent of normal, I would say, of limitation of motion on bending to the *667 left and a pretty good history, made good sense. He said that when- he had this back pain, if he would lay down and lift his legs up on a pillow, it felt better and so forth; the pain was aggravated when he stood all day in the store; that night it would hurt. If he’d take a break during the day, get off his feet, it didn’t hurt as much. I estimated that it was worth about — I mean for the fatigue and disability and lifting —I estimated that at about 20 percent disability of the back.”
Dr. Wickstrom testified that the 20 percent disability would be of the body as a whole. He also felt a large mass which “felt like a big blood clot deep in the tissues,” on his second examination which was two months and two days after the accident. Dr. Wickstrom further testified that he “felt definitely that he had damage to his right erector spina group of muscles; that is the group of muscles that runs up the side of the spine that holds you erect.” He further testified that damage to the nerve or muscle ligaments would not show on X-ray unless there was calcium formation in the scar. He concluded that petitioner could expect discomfort on heavy lifting or prolonged forward bending.
Dr. Goodall, a neurosurgeon of Houston, Texas, examined petition on August 14, 1954, and May 28, 1955. The only objective symptoms he found was “an area of numbness along the right, or outer aspect of the right leg or foot.” He testified as follows:
“He was hit, and the same thing occurs as when you shake a buggy whip, you get a whip-lash type of injury. Whenever you get an injury of that type and you find that the neurological examination does not show gross paral-1 ysis, you know that changes must have taken place in the nervous system because of the hemorrhage into the nerves or into the brain which causes unconsciousness. The body lays down scar tissues in the nervous system.”
He stated that scar tissue would cause pain, and that from the history and his examination, the patient had sustained injuries to the ligaments in the area of the right sacro-iliac joint. He concluded that the “pain was of a permanent nature due to the instrinsic changes in the nerves, muscles and ligaments rather than to a disc involvement that would involve surgery.” Dr. Goodall felt that petitioner’s conditions would gradually increase as time goes on because “as we get older and have scar tissues forming in the nervous system, we also have constant changes due to age. You begin to get a little hardening of the blood vessels. The blood supply to the nerves is not as great at the age of 50 as it is at 25, and, of course, as years go on the changes will progress more. You may get calcium deposits, arthritic changes.”
The above medical evidence is overwhelmingly to the effect that petitioner did receive serious and painful injuries to his lower back, as well as other injuries. His present pain and' disability is due either to a permanent injury to the muscles and ligaments or to an irritation of the nerves by an internal scar resulting from the accident, and that there is some permanent disability. The medical evidence shows that the pain and disability will probably increase with the passage of time, and the lay testimony shows that petitioner was not a malingerer, but a hard working and civic minded man. In the face of such testimony we are certainly unable to find any obvious error on the part of the jury.
While we are unable to determine exactly how the jury reached an award of damages in the amount of $19,390, the record shows that there were damages to petitioner’s tractor and trailer in the amount of $1,182.00 and medical expenses of $595.50. It further shows that he was required to employ additional employees at a cost of $306, and that there was some loss of business income, and minor damages to clothing which petitioner was wearing at the time of the accident.
In Burnett v. Yellow Cab Co. of Shreveport, La.App., 50 So.2d 670, 676, decided in 1951, a 55 year old mail carrier and part-time carpenter was injured through negli *668 gence of the driver of a cab. The court said:
“The medical testimony as a whole established that plaintiff received a serious injury, including the compression fracture of the twelfth dorsal vertebra, together with an undetermined amount of damage to the nerves and other tissues in the immediate area. The preponderance of the testimony is that his condition will improve, although it is not established that his recovery will ever be complete. * * *
“The jury was justified under the evidence in concluding that plaintiff was, at the time of the trial, disabled from carrying on his occupation as a mail carrier or from dping heavy carpentry work, either as a result of the injury itself or as an outgrowth of the treatment, that followed. The testimony does not establish the duration of this condition and the completeness and extent of the potential recovery.”
In the Burnett case the Court reduced the verdict from $25,000 to $20,000 plus $310 as medical expenses. It was found that the petitioner was, at the time of the trial, disabled from carrying on his occupation as a mail carrier or from doing heavy carpentry work.
In Reeves v. State, La.App., 80 So.2d 206, 214, the appellate court increased the judgment from $15,457 to $20,457 for a severe compression or crushing of the eleventh dorsal vertebra, commonly referred to as a “broken back.” In that case it was shown that, one year after the injury, petitioner was unable to do hard physical labor and activities such as lifting, stooping, repeated bending over to pick up objects, etc. The Court concluded:
“No other conclusion could be reached other than that plaintiff is disabled for life and that he will experience and suffer pain and discomfort hereafter, with the possibility of an increase in the difficulty and suffering; and that he will never be able to do any work or engage in any undertaking or recreation which requires strenuous exercise, such as stooping, bending or lifting.”
Although we are unable to determine whether the injuries in the present case are as serious as the injuries .sustained by petitioner in the Reeves case, certainly the result of the injuries to petitioner in each of the cases are strikingly similar.
Defendant cites the cases of Hogg v. Department of Highways, La.App., 80 So.2d 182, wherein the award of $4,233.90 was-made, and Miller v. Derusa, La.App., 77 So.2d 748, wherein the award was $8,000. In the Hogg case, the petitioner’s injuries consisted of a fractured cervical vertebra, concussion, injuries to the knee, and slight impairment of motion in the neck with some-discomfort. In the Miller case, the petitioner suffered a skull fracture, a speech impediment, and was unable to work. In the-Miller case, the record discloses that the-evidence was in hopeless conflict, and there is no indication as to the intensity of the pain and suffering of petitioner, nor of any permanent disability. There is also no-indication of the pain and suffering, or disability, in the Hogg case.
Under the circumstances of the present: case, we are unable to determine that the-award, by the jury was either insufficient, or excessive, and the judgment below will be affirmed. '
For the reasons hereinabove assigned, the judgment of the Lower Court is affirmed, all costs to be paid by defendant-
judgment affirmed.