101 So.2d 720 (1958)
Jack LE BOURGEOIS et al., Plaintiffs-Appellees,
v.
INDIANA LUMBERMENS MUTUAL INSURANCE COMPANY et al., Defendants-Appellants.
No. 4576.
Court of Appeal of Louisiana, First Circuit.
March 17, 1958.
Rehearing Denied April 21, 1958.
*721 Huckabay & Wall, Baton Rouge, for appellants.
Joseph A. Sims, Hammond, for appellees.
ELLIS, Judge.
Jack LeBourgeois, Mrs. Julia Farrell Le-Bourgeois and Mrs. Ida LeBourgeois instituted this suit for property damages and personal injuries arising out of a head-on collision involving a 1951 English Consular Sedan owned and driven by Jack LeBourgeois, and a 1954 pickup truck owned by defendant, Reimers-Schneider Company, Inc., and insured by Indiana Lumbermens Mutual Insurance Company. The truck was being driven by defendant, Douglas H. Vining, an employee of Reimers-Schneider Company, Inc., at the time the accident in question occurred. The facts surrounding the head-on collision are undisputed and we set them forth below.
Douglas Vining had had difficulty with the truck's brakes prior to the date of the accident. This is evidenced by his testimony as follows:
"Q. How long had you had it in your possession for your use? A. About a week.
"Q. When you took over this truck to use in your work did you find any difficulty or mechanical trouble with it? A. I did with the brakes.
"Q. When you discovered that condition what did you do with the truck? A. I put it in the Ford place in Hammond on either Thursday or Friday and left it there and used another vehicle and picked it up about 5:30 Monday morning and they were supposed to work on the brakes. (Emphasis ours.)
"Q. Who left the truck with the Ford people? A. I did.
"Q. Do you recall with whom you talked there? A. I don't.
`"Q. What instructions did you give them with reference to the car? A. I asked them to check the front end, the brakes and give it a complete tune up."
There is some testimony to the effect that he had little or no trouble with the brakes after picking the truck up from the Ford company until he applied the brakes suddenly, moments before the accident. We find no evidence in the record indicating that Vining had tested the brakes of the pick up truck after the repairs were made to determine whether they were properly repaired and in good working order.
Just prior to the accident Jack Le-Bourgeois, his mother, Mrs. Julia Farrell LeBourgeois and Mrs. Ida LeBourgeois were riding towards Ponchatoula on Highway 22 approximately two miles south of Springfield, Louisiana. Vining was driving west on this highway in the 1954 pick up while under orders of his employer, Reimers-Schneider Company, Inc. He had just rounded a curve and noticed the Le-Bourgeois automobile approaching at a distance of around 250 to 300 yards. According *722 to Vining's testimony when their vehicles were 150 feet apart a cow apparently attempted to cross the road from a ditch. Vining, upon seeing the cow, suddenly applied his brakes and the front left wheel brake locked, throwing the truck out of control and into the path of the oncoming car. A collision occurred resulting in personal injuries to all of the plaintiffs as well as the defendant, Vining. LeBourgeois' automobile was completely demolished and extensive damage was done to the pick up truck. There were no eyewitnesses to the accident, however, there is little dispute that the pick up truck swerved across the line into the path of the on-coming car of LeBourgeois.
Defendants contend plaintiffs failed to prove Vining was guilty of negligence constituting the proximate cause of the accident.
This suit was tried in the District Court before a civil jury which found that the defendant, Douglas Vining, was guilty of negligence, and that his negligence was the proximate cause of the accident, and accordingly granted damages to the three plaintiffs as follows: $10,000 damages to Jack LeBourgeois, $13,000 damages to Julia P. LeBourgeois; $18,000 damages to Ida LeBourgeois Bruce, and damages in the amount of $601 to Edgar Bruce was filed suit herein as head of the community between himself and Ida LeBourgeois Bruce. This final item of damages was for the medical bills and estimated future medical bills as well as eight round trips to Dr. Scarborough's office.
Defendants moved for re-hearing which was rejected by the trial judge.
On motion of counsel for plaintiff in opposition to the motion for a new trial by the defendant and at the suggestion of the lower court, entered a remittitur of 50% of the amounts awarded in each instance of damages of the jury awards, the remittitur being based on the fact that the amounts awarded by the jury were excessive under the jurisprudence and previous decisions of the State of Louisiana. To this ruling the defendants entered an objection and from the judgment as approved by the trial judge, defendants have appealed to this court. They contend that Vining was guilty of no actionable negligence, that if Vining was guilty of actionable negligence, the awards as reduced by the District Court were excessive.
In view of the fact that it is undisputed that the Vining truck suddenly turned from its proper lane of travel to its left directly into the lane of travel of the approaching plaintiff automobile, there was a presumption of negligence under our law against Vining, and the burden was upon him to exculpate himself from the prima facie negligence against him. Noland v. Liberty Mutual Insurance Company, La.App., 89 So.2d 428; Mershon v. Cutrer, La.App., 95 So.2d 143; Mead v. Cutrer, 232 La. 667, 95 So.2d 143; Rizley v. Cutrer, 232 La. 655, 95 So.2d 139; Schick v. Jenevein, 145 La. 333, 82 So. 360; Miller v. Hayes, La.App., 29 So.2d 396.
In the case of Rizley v. Cutrer, supra, the Supreme Court of Louisiana stated [232 La. 655, 95 So.2d 140]:
"Since the primary cause of the collision was Cutrer's act in driving his car into that part of the roadway reserved exclusively for traffic proceeding from the opposite direction, a mere statement of the accident makes out a prima facie case of negligence against Cutrer and, therefore, it was incumbent upon defendant to show by clear and convincing evidence that Cutrer's sudden presence in plaintiff's traffic lane was due to unexpected and unforeseen circumstances over which he had no control and that he did not in any particular contribute to the mishap."
Defendants cited several cases to exculpate Vining of negligence in this matter. The leading case cited by defendant was Anderson v. London Guarantee *723 & Accident Co., La.App., 36 So.2d 741, 748. The pertinent rules of negligence were set forth clearly in the Anderson case. We find the following rule quoted from the Restatement of the Law of Torts, Section 300, to be particularly applicable to the case at bar:
"When an act is negligent if done without reasonable preparation, the preparation which the actor, to avoid being negligent, is required to make for the doing of the act is that which he, as a reasonable man, should recognize as necessary to prevent the act from creating an unreasonable risk of harm to another.

* * * * * *
"The preparation which the actor must make is that which he as a reasonable man would regard as necessary

* * * * * *
"The word `preparation' includes, not only the correction of known defects in a vehicle, tool or other instrumentality, which should be recognized as likely to make its use dangerous, but also such inspection as a reasonable man would recognize as necessary to ascertain whether it is in a condition fit for use. A failure to make an inspection does not create liability unless the inspection, if made, would have disclosed the particular defect which makes its use harmful to another."

Counsel for the defendant also relies upon the case of Woodward v. Tillman, La.App., 82 So.2d 121, 123, in which this court stated, among other things, as follows:
"There is a strikingly similar case in our jurisprudence in which the appellate court found that omissions equivalent to those of Charles N. Tillman in the instant case constituted negligence of a degree sufficient to justify a judgment for the plaintiff. In that case, Gordy v. Calcasieu Gin Co. Inc., 15 La.App. 408, 132 So. 277, 278, the defendant, knowing that his brakes were defective, continued to allow his agent to use his automobile. As the agent approached an automobile moving in his lane, he applied the brakes to avoid hitting it. When he did so, his automobile swerved to the left, due to the defective condition of his brakes, and collided with an approaching automobile.
"In finding the defendant guilty of negligence and liable to the plaintiff in damages, the Court had this to say:
"`That Guidry knew of the defective condition of the brakes on the Chevrolet coupe before the accident is borne out by the testimony of G. E. Welch, the mechanic to whom he intrusted his car for repair after the collision. This witness says that he told him to repair the damage done by the collision, and particularly requested that he look over the brakes, as they had locked on him that morning. The mechanic did examine the brakes and found such a defect as might cause them to lock at any time, and the car would then have a tendency to go to the left. This is just what happened at the moment of this accident. It was negligence, in view of this knowledge he had, for this agent of the defendant to operate the car in that condition on the highway, and, for his negligence, defendant is answerable for the damages occasioned by the collision.'
"Defendant cites the case of Anderson v. London Guarantee & Accident Co., La.App., 36 So.2d 741, 747, for the general rules of negligence found therein. Its contention, under these rules, is that the negligence of the insured was not reprehensible for the reason that the accident which actually occurred was not the probable or anticipated danger or consequence of the insured's negligence. However, it *724 is difficult to imagine what could be more probable or anticipated, when one has knowledge that his brakes are, on occasion, pulling his automobile sharply to the left, than that they should do so again at an inopportune moment.
"The insured testified concerning the first time the brakes locked that he `had fully intended should the car continue to grab to take it on and have Audubon Motors repair the brakes, but apparently, after trying it several timesabout four times' he was satisfied to his `own mind that possibly there had been some slick tar on the road back there that the opposite wheel had slid in and didn't make it have the same friction bearing.' The insured owes the public a duty of reasonable care in the operation of his automobile upon the public thoroughfares. He failed to perform this duty when he neglected to have his brakes checked and repaired by a mechanic after he became aware that they were probably defective. The mere possibility that the incident had been caused by slick tar on the road does not relieve the insured of his duty to the public.
"The owner and operator of the vehicle is chargeable with a higher degree of care than is a mere guest passenger. Actions which would constitute negligence on his part would not be tantamount to negligence on the part of his guest. The passenger, not driving the automobile and not being able to feel its response to brake and steering wheel would certainly be unable to have such knowledge of the cause of the near accident as would cause him to assume the risk of travelling in defendant's automobile with defective brakes. In addition, there was a lapse of several hours between the incident which occurred on the way to work and the accident which happened in the later afternoon in which the insured could and should have had the brakes examined and possibly repaired. The plaintiff was not in a position to supervise the insured's actions in this respect, nor to question concerning them."
While this court did say in the Tillman case that he should have taken it to the garage as he had full knowledge of the defective condition of the brakes, however, the fact that Vining did take his truck to the garage does not relieve him of negligence in this case under the facts. He left the truck with instructions to fix the defective brakes which were "grabbing", but he went back at 5:30 on Monday morning before the garage opened and no one was at the garage and he, therefore, could not ask whether the truck had been repaired, but as the key had been left in it he must have assumed that it had been repaired and hence drove it from the garage. He did not make any inspection of the brakes by applying them until an emergency arose, and they were still in the same defective condition. Therefore, Vining did only a part of what he should have done, that is, taking the truck to the garage with instructions to repair the brakes was proper, but taking the truck without any inspection of ascertaining whether it had been fixed and then without any test, constituted negligence on his part. Under the facts Vining has failed to overcome the prima facie presumption of negligence.
The jury correctly decided the question of defendant's negligence for the reasons above set forth.
We will discuss the quantum separately as to each plaintiff.
The record shows that Jack LeBourgeois had been and was at the time of the accident suffering from high blood pressure which had prevented him from working for some years prior to the accident. Dr. H. M. Scarborough, to whom these three plaintiffs were taken immediately after the accident, had been treating the LeBourgeois family for approximately two and a half years prior *725 to the accident, and described Jack Le-Bourgeois' condition prior to the accident as controlled hypertension. Dr. Scarborough stated that when Jack LeBourgeois arrived at his office he was complaining of pain over his left chest, also over his left arm and over his hip, and appeared to be in severe pain when brought into the office. On examination he found LeBourgeois to be extremely tender to pressure over the left chest and could hardly stand him to touch it, as well as over his left arm. LeBourgeois was also unable to move his left arm very well without pain and was unable to draw a deep breath without severe pain. He also had hemotoma, which Dr. Scarborough stated was a hemorrhage into the muscle of the hip, which caused him some pain and difficulty when he walked. In addition Le-Bourgeois had a laceration of the left elbow which had stopped bleeding at the time he saw him. Dr. Scarborough also thought that LeBourgeois had fractured ribs, however, he did not see them on an x-ray, Dr. Scarborough's bill for treating Le-Bourgeois was $21, which included four trips subsequent to the accident. Dr. Scarborough left Ponchatoula in October and went to the Baptist Hospital and Dr. Feder began treating these plaintiffs. Dr. Scarborough last saw LeBourgeois on September 18, 1956, at which time he testified that LeBourgeois "complained of no symptoms. The biggest thing he had wrong at that time was anxiety, tension and nervousness."
Dr. Feder of Hammond, La., saw the plaintiff Jack LeBourgeois nine times beginning January 22, 1957 and stated that "his symptoms when I saw him were mainly centered about the fact that he was extremely nervous and found it difficult to sleep at night and complained of discomfort and pain in the left region of the lower chest, more severe on movement and not all the time, but especially when he arose in the morning. He also was rather emotional when I saw him and complained of headaches, and upon examination I found a rather extremely nervous man, approximately 54 years of age, the unusual thing about him was his blood pressure which was 250/120. I found also a healed scar of the left elbow which he stated was injured in the accident.
"Of course, he was extremely apprehensive and there was some tenderness on palpation of the chest area which he told me was not excruciating pain but more or less aggravating pain. I suspected he had some pathology of the chest and sent him to be x-rayed by a specialist, Dr. Malen, of Malen and Woolfolk in Baton Rouge, and there it was found he suffered fracture of the eighth, nineth and tenth ribs, and at the time the findings of the radiologist were not inconsistent to the injuries which could have happened in July, 1956. They were old but healed."
Dr. Feder made an examination on two separate days, January 22nd and January 25th, in order to re-check. Dr. Feder was of the opinion that the accident enlarged on Jack LeBourgeois' hypertension or high blood pressure. Dr. Feder's medical bill or charges for Jack LeBourgeois including drugs was $61. On cross examination Dr. Feder testified that when the tenderness or resulting pain caused by the three broken ribs ceased that "I don't look for any residual or untold effects from that." Dr. Feder also under cross examination stated that knowing that Dr. Scarborough had x-rayed Jack LeBourgeois he secured the x-rays and had them examined and Dr. Malen informed him that the clavicles "unfortunately, are not visualized. Information with respect to the clavicle on the right is therefore not obtained in this examination at that time." As we understand it the x-ray by Dr. Scarborough was not clear enough or taken so that an adequate examination could be made so as to determine whether they revealed broken ribs or not.
We believe that an award of $3,000 would be adequate and just for the personal injuries of Jack LeBourgeois which included three broken ribs, lacerations and pain and suffering and possible temporary aggravation of his hypertension. His medical *726 bills amounted to $82 to which he is entitled to be compensated also. His small automobile was completely destroyed and he prayed for $750 on this item of damage. The record reveals that he paid more than $1,700 for this automobile at the beginning of 1952 and that it was a 1951 model and that he had purchased it to go back and forth mainly to the doctor in Ponchatoula. Based on the evidence, we believe that an award of $450 would be proper for the destruction of this five year old car. The total award to Jack LeBourgeois is therefor $3,532.
Dr. Scarborough examined Mrs. Bruce immediately after the accident and testified that she was complaining of severe pain and that someone had to assist her into his office. Her complaints of pain were limited to her back, both knees and the left arm and elbow. On examination he found "quite a few bruises and brush burns. Her major findings were laceration of the left elbow, we noted on having her stand she could not stand straight but stood with her body tilted somewhat. She was not able to straighten up without pain. On checking further into her back she had spasms of the muscles in the lower back. On pressing on the muscles tenderness was found in the lower back. Both knees were slightly discolored, there was not much swelling at the time. She complained of a considerable amount of pain on standing with one of the knees and when we attempted to bend the knee up." Dr. Scarborough diagnosed her condition as a lumbo sacral sprain, also injury such as bruises and abrasions of both knees and both elbows. His prognosis was that Mrs. Bruce "will get complete recovery from the knee. Further follow up will determine recovery from the back." In other words, the back was the only possible permanent injury. Dr. Scarborough saw Mrs. Bruce again in September and found spasms in the muscles of the lower back and complaints of pain in the back and one knee, however, the swelling had subsided and she was able to be more erect than at the onset of the injury. At this time he felt that she had improved but could not predict with any certainty what might happen to her injured back. His treatment consisted of codein for pain, sedatives for her apprehension as it seems she was unduly nervous and placed her on bed rest to heal her back and knees. This doctor also testified that he had treated this family or been their family physician for approximately 2 years prior to the accident and that Mrs. Bruce had never complained of or been treated for any back injury or troubles.
Dr. Feder examined Mrs. Bruce on the same two days that he examined Jack Le-Bourgeois and Mrs. Julia LeBourgeois and stated that during this time she was still complaining of pain in the lower back, with her main difficulty an inability to stoop, which was more acute in the morning, to such an extent that her back was stiff and she couldn't get out of bed. She also complained of inability to sleep because of nervousness and pain in the abdomen, left shoulder, neck region and both knees. On examination Dr. Feder found limitation of motion of the lower lumbo sacral region with some paravertebral muscular spasm over the lumbo sacral region on both sides. Anterior flexion could be accomplished to about 90 degrees, after which Mrs. Bruce complained of pain and he found an increase under such conditions of the paravertebral muscular mass spasm. He found Mrs. Bruce extremely apprehensive and extremely nervous and she seemed to have a dread that something was broken in her back. Dr. Feder recommended an x-ray which was done and Mrs. Bruce was found to have a rather extensive hypertrophic arthritis of the lower thoracic spine, which Dr. Feder explained was "above the part that she complains of her pain. The entire thoracic spine showed a degenerative arthritis which was of long duration. Dr. Feder stated that this accounted for the increased kyphosis of the thoracic spine but on the other hand there was no significant findings in the part of the spine of which this woman complained of the pain." There were no x-ray findings of fracture or other disease. *727 Dr. Feder felt that Mrs. Bruce had a definite condition of the lower back and that further study should be done to evaluate just what she did have in view of the fact that she had symptoms which had not cleared up. He was unable to say whether it was an aggravated arthritis due to trauma or some deeper injury to the intervertebral disc system. Dr. Feder stated that there was no history of any type of back ache previous to the accident and that due to the persistent symptomatology such as pain, spasm and limitation of motion since the accident which has not been relieved, he felt that Mrs. Bruce's complaint was due to contusion and sprain which aggravated the dormant pre-existing hypertrophic arthritis. Further that if it did not clear up with direct treatment of steroid and diathermy and exercise, he would recommend myelography to rule out or find damage to the intervertebral disc in the area. In addition he felt that Mrs. Bruce definitely had an anxious state to which he contributed a little of her complaint such as abdominal pain and other traumatic references, since ordinary contusions of the shoulder and chest and abdomen without fracture should have cleared before. He believed that the actuality of the pain was as real to Mrs. Bruce as if she had pathology, as she was the excitable type, and the feeling that she had something "broken in her back" had aggravated the anxiety state which she had about her condition. He saw Mrs. Bruce nine times. Dr. Feder did also testify that he believed that Mrs. Bruce had traumatic arthritis of the knee.
Dr. Charles McVea of Baton Rouge examined all three of the plaintiffs and testified. As to Mrs. Bruce he stated that she was complaining on the date of the examination, viz., December 22, 1956, that ever since the time of the accident she had suffered from soreness in her knees. In addition she complained of soreness in her left shoulder, pains in her head from time to time and that she suffered with headaches which she did not have prior to the time of the accident, although she did not remember striking her head in the accident. Dr. Mc-Vea stated that a review of the systems of the body revealed that Mrs. Bruce had some complaints relative to all and that she complained of soreness in her abdomen which she associated, however, with eating. Dr. McVea's physical examination showed nothing of significance in Mrs. Bruce's head, neck, chest, heart or lungs which could in any way be related to the accident, and an examination of her breast showed no contusions, no tumor masses, no tender areas. No tender areas were noted in an examination of her chest or abdomen. Examination of the lower abdomen revealed no tenderness and of her lower extremities revealed no contusions, no swelling, no tender areas and no loss of sensation and no abnormal reflexes. X-ray examination of the left shoulder, lower thoracic spine, low back and both knees showed no evidence of trauma or significant pathology. The x-ray of the thoracic spine revealed a slight arthritic lipping therein and an upward tilt of the right side of the pelvis due to a shortening of the left lower extremity, together with some minimalosteo-arthritic lipping in the lumbar spine. He found no significant pathology in either knee. His diagnosis was probable general contusions following the accident. On the date of the examination Mrs. Bruce's complaints were not supported by findings on physical examination and, in his opinion, were not the result of injuries sustained at the time of the accident. He believed that as far as the accident was concerned, Mrs. Bruce was fully recovered. His examination was completed in approximately thirty minutes.
From the above resume of the testimony with regard to the findings and opinions of the three doctors who examined and two of them treated Mrs. Bruce, there is no manifest error in the finding of the jury that Mrs. Bruce's injuries were much more serious than Dr. McVea pictured them. Dr. Scarborough had treated these three plaintiffs for approximately two years and was familiar with all their previous ailments and complaints and they came to his office *728 from the scene of the wreck, and Dr. Feder examined and treated them after Dr. Scarborough moved from Ponchatoula to New Orleans which was about the month of September, 1956, or two months approximately after the accident, whereas Dr. Mc-Vea examined them for thirty minutes approximately five months after the accident.
Based upon the testimony of Dr. Scarborough and Dr. Feder which as stated the jury and judge evidently accepted without committing manifest error, we believe an award of $9,000 to Mrs. Bruce for her personal injuries, pain and suffering and disability would be adequate under the facts.
Mrs. Bruce's husband was also a plaintiff and is entitled to a judgment for medical bills of $125 and for fourteen trips to the doctor for which Mrs. Bruce testified that she had a list of the people that had transported them to the doctor for a charge of $10 per trip. Therefore, Mr. Bruce is entitled in addition to a judgment for $140 or a total of $265.
Mrs. Julia LeBourgeois was 84 years of age and when brought to Dr. Scarborough's office he stated that she appeared in acute distress at the time and seemed to be having a lot of pain over the central part of her chest, whether the doctor pressed on it or not. She was unable to take a deep breath and when she did, it seemed to cause quite a bit of distress. Dr. Scarborough stated that she had a laceration or cut over the left hand, "as if the entire hand had been mashed and around the top of the hand over the index finger and into the joint." In addition she had hemotoma of the top dorsal of the hand and muscles and tenderness. Her hand was bruised and considerably swollen and it was also bleeding profusely from this wound. Also she was complaining of pain in the left leg on which there was a bruise. Dr. Scarborough also stated that she had minor bruises and abrasions.
Dr. Scarborough sewed up, that is, took approximately 35 stitches in the cut on top of her hand. He stated that this was unusual as ordinarily they used only one tube of suturing material, but in this case he used four tubes. After the hand had been attended to there was a hemorrhage and infection set in and the suture broke loose, allowing the wound to open up again, and following this proud flesh formed which had to be cut out and burned in order that good skin could grow. He saw Mrs. Le-Bourgeois the last time about September 17th or 18th and he was of the opinion that there would be permanent disability in that the left hand would be permanently stiff, and that prior to the accident she had full use of this hand. He estimated that she had been to his office between 15 and 20 times.
Under cross examination Dr. Scarborough testified that prior to the accident he had treated Mrs. LeBourgeois for arthritis which was mainly limited to her knees, however, she had generalized osteo-arthritis in her hand. In reply to the question on cross examination as to what was the condition of her hand the last time he saw her in September, he stated that it had healed very nicely on top but that she had a limitation of motion in the middle joint of the index finger and also across the finger and hand joints of the third, fourth, and fifth carpal phalangeal joints and the terminal joint of the fourth finger was frozen, and that she was not able to close her hand very well, all of which in his opinion was caused by the accident.
Dr. Feder examined Mrs. LeBourgeois on January 22, 1956 and found that her chest injury had cleared up, although the patient complained to have some residual pain in the region of the sternocostal junctions on the right. Her main complaints were the left arm, to the effect that she had little use of it, and was unable to open or close her hand and that she had no grip. Dr. Feder stated that her left hand is held in the position of interphalangeal flexion, and that she cannot fully extend the fingers of her hand. He also found limitation of wrist motion, and examination of both *729 hands by x-ray showed well advanced hypertrophic arthritic changes. Dr. Feder felt that her chest healed completely without any injury resulting as a consequence of the accident. He further believed that she had a residual disability of about 40% in her left hand which was due to the trauma and infection "and crushing effect of a pre-existing disease and this disability is permanent. With her condition I feel the condition is progressive and could result in aggravation of the pre-existing arthritis. She cannot close her fist properly and has very little grip in her hand and holds it in a position approximating a typical `claw hand'."
On Dec. 22, 1956, Mrs. LeBourgeois was examined by Dr. McVea on behalf of the defendant. Her only complaints to this doctor were as related to the left hand which she stated gave her a good deal of discomfort and she could not close the hand or close the fingers as well as she would like to, or as well as she could prior to the time of the accident. An examination by Dr. McVea revealed a "deformity of all the fingers of the hand but particularly of the tip of the left long finger which was bent down toward the volar surface of the hand." X-ray examination by Dr. McVea he stated revealed advanced degenerative arthritic changes involving all the interphalangeal joints most prominent at the level of the distal joint. In his diagnosis he stated "I feel sure that as a result of this injury to her hand she had some aggravation of the stiffness and inability to use her hand as a result of the arthritis which she already had." He also stated that she could close the hand and make a fist and use the hand "rather well, but I do not believe she has as a result of the accident more than 5% disability in the left hand. I think this is permanent, however."
We believe that the award by the jury of $13,000 was manifestly excessive, but that the award of $6,500 resulting from the forced remittitur is not manifestly erroneous under the facts.
We therefore believe that the award of $6,500 is adequate and just for her pain, suffering and permanent disability to her left hand as a result of the accident. It is shown that she is entitled to $189 as medical expenses.
It is therefore ordered that the judgment of the lower court is amended as above set forth and as amended is affirmed.