SAMUEL, Judge.
This is a suit for personal injuries and special damages resulting from a fall by the plaintiff, a tenant, from the balcony of her second floor apartment. Named defendants are Crescent Arms Apartments, Inc., the landlord, and that corporation’s liability insurer, Phoenix Assurance Company of New York. Because of a stay order issued in a bankruptcy proceeding involving Crescent, the case went to trial, and is before us, only as to Phoenix. That defendant’s answer to plaintiff’s petition denies negligence on the part of its assured and alternatively pleads contributory negligence on the part of plaintiff. After trial there was judgment in favor of Phoenix and against plaintiff, dismissing the suit. Plaintiff has appealed.
The material facts of the accident are not in dispute. Plaintiff was the only eye witness, the trial judge accepted her testimony and appellee, which offered no witnesses or evidence, makes no complaint in connection therewith.
At the time of the accident plaintiff was 51 years of age, 5 feet inches in height and weighed a little more than 180 pounds. For more than a year she had rented and lived in the second floor apartment which included a balcony. The balcony was small, about 3 or 4 feet in width. It was surrounded by an iron balustrade, approximately 3 feet in height, consisting of a rail at the top and a lower rail 6 or 7 inches from the balcony floor, the two rails being connected by balusters about 4 inches apart from each other. The top rail was broken or unwelded and had been in that condition for more than a year. Both the plaintiff and the landlord corporation knew of the defect. Plaintiff did testify that, although she knew of the defect, she thought the balustrade was “steady” (which we interpret as being sufficiently strong and stable so as to serve its purpose) and that she did not believe the landlord corporation would allow the defect to remain if this were not so.
The fall occurred after dark between 7:30 and 8 p. m. Plaintiff had been sitting on the balcony on a kitchen chair. She went into the apartment and remained there over a period of about two hours. Upon returning to the balcony to bring the chair back into the kitchen, she found water and suds had run down from the third floor on the chair and over the porch floor. As the plaintiff expressed it, there was plenty of sudsy water on the porch, “enough to be swept off and not left there”. She then reentered the apartment, obtained a broom and returned to the balcony. With the broom in one hand she started to pick up the chair with the other hand in order to drain the water off the chair. At that time she slipped, dropped the broom and caught the partially opened door which led from the apartment to the balcony. The door opened farther towards her, struck her in the chest and she fell backwards, striking the balustrade in a somewhat sitting position. She fell through the balustrade and to the ground one floor below in a similar or sitting position.
As stated in the trial judge’s reasons for judgment, after concluding plaintiff had fallen through the balustrade as she had alleged and testified, two questions were presented for the court’s determination (the same two questions now presented for this *635 court’s determination): (1) was the fact that the top rail of the iron balustrade was broken, or not welded together, the proximate cause of plaintiff’s fall and resulting injury? and (2) if so, was plaintiff guilty of contributory negligence?
The trial judge did not reach the second question. Although he found the defect in the top rail clearly contributed to the accident, in the absence of any evidence showing that had the top rail been repaired plaintiff would not have fallen through the balustrade (or that the balustrade would not have broken under her weight and thus resulted in the fall), and the record contains no such evidence, he concluded the defect in the top rail was not the proximate cause of the accident. We must disagree with this conclusion.
Under LSA-C.C. Articles 2692(2) and 2695 the lessor is bound to maintain the leased premises in a condition permitting the use for which it is leased and, provided they do not arise from the fault of the lessee, the lessor guarantees the lessee against all vices and defects of the leased premises and must indemnify the lessee for any loss resulting therefrom. These articles required the lessor in the instant case to provide plaintiff with a safe balustrade, one which would serve its purpose of preventing a fall off the balcony. If it is a fact that even a proper balustrade would not have prevented the fall upon which this suit is based, the burden is upon the defendant, and not the plaintiff, to prove that fact and the absence of such proof is attributable to the defendant rather than the plaintiff. The defect in the top rail having clearly contributed to the accident, it was a proximate cause thereof.
In support of its plea of contributory negligence defendant relies principally upon two cases, Turner v. Aetna Casualty & Surety Company, La.App., 175 So.2d 304, and Jackson v. Clifford, La.App., 159 So.2d 723. We find both are distinguishable.
In Jackson the plaintiff, a domestic, slipped and fell on a wet basement floor. This court denied recovery, holding the fall was due to plaintiff’s own negligence in not taking ordinary care relative to the wet floor which she herself had created while cleaning it. In the instant case plaintiff does not seek recovery for injuries received in a fall to the floor of the balcony; the injuries for which she seeks recovery were occasioned by her fall to the ground from her second floor balcony, a fall proximately caused by the defect in the top rail of the balustrade, a defect which, insofar as the record is concerned, prevented the balustrade from performing its obvious function.
In Turner the plaintiff, a tenant, was injured when she fell on a defective porch floor of the rented premises. The porch floor was in a dilapidated condition and a poor state of repair; it contained a large hole approximately 18 inches wide by 24 inches in length and the floor surrounding the hole was rotten with the planks jagged at their broken ends. In crossing the porch plaintiff stepped on the edge of a plank from which her foot slipped into the hole. After balancing herself she stepped backward on the second plank from the hole. That plank broke and caused her to fall. On original hearing the court affirmed a judgment in favor of plaintiff, holding her contributory negligence in stepping into the hole was a remote cause of the accident and the breaking of the plank was a direct and proximate cause thereof. On rehearing the court reversed, holding the decayed and jagged condition of the boards immediately surrounding the point where plain-' tiff stepped into the hole was little different from the plank which gave way when she stepped back in an effort to regain her balance, what had occurred was one continuous chain of events, and plaintiff was guilty of contributory negligence in failing to take ordinary care under the circumstances. Again, in the instant case plaintiff does not seek recovery for injuries sustained as a result of slipping in the sudsy water to the floor of the balcony; she seeks recovery for the injuries resulting *636 from her fall through the balustrade to the ground below.
Anderson v. Simmons, La.App., 75 So.2d 34 is apropos. In that case plaintiff, the wife of a tenant, sued the landlord for damages resulting from a fall from the porch or gallery of the leased premises to the yard below. The balustrade of the gallery was in a rotten and decayed condition, a fact known to the plaintiff. She placed a chair on the porch for the purpose of sitting there. In attempting to move back a clothes line containing her wash, which blocked off part of the porch, she lost her balance and reached over to the balustrade for support. The balustrade gave way and she fell from the porch to the ground. The court held the plaintiff was not guilty of contributory negligence in reaching for the balustrade when she lost her balance even though she knew of its rotten or decayed condition.
In this case plaintiff had some reason to believe the balustrade would perform its function and she did not intentionally come in contact with the balustrade. Her attempt to sweep or clean away the sudsy water from the chair and the porch, a condition she had not created, was entirely proper; it was the act of a good tenant. Thus the instant case, more clearly than Anderson, requires a holding that plaintiff was not guilty of such contributory negligence as would bar a recovery by her.
Testimony concerning plaintiff’s injuries was given by the plaintiff, her employer, her pastor, and four medical experts, Drs. Julius Levy, a general surgeon and the treating physician, R. W. Levy and D. E. Richardson, both neurosurgeons, and H. R. Soboloff, an orthopedic specialist. All of these witnesses were called by the plaintiff.
The lay testimony establishes: Prior to the accident plaintiff was employed as a housekeeper at a salary of $50 per week. Her employer, engaged in the ladies sportswear business, also used her services in that business during peak work loads for an additional salary. She had been a regular, active participant in numerous church activities prior to the accident. Following the accident she was unable to perform her duties as well as previously and, while she was retained by her employer as a housekeeper at the same salary principally because she was an excellent cook and responsible, it became necessary for her to hire outside help to assist her with the heavy cleaning duties. Her church activities likewise were curtailed to a great extent.
Plaintiff testified the accident occurred on a Sunday. She was unable to get up from the ground after her fall and had to be assisted by two young boys, the only people around at the time. The following day she went to a hospital where she was seen by Dr. Julius Levy. She remained in the hospital in bed for one week and thereafter returned home with instructions not to get up at all. She remained in bed at home for seven weeks, phoning the doctor daily. During this period she took medicines and pain pills prescribed by the doctor. At the end of seven weeks she was permitted to get up twice each day to go to the bathroom, and back. Between three and four months after the accident she returned to work because she had to (apparently for financial reasons). At the time of trial plaintiff complained of pain in the lower part of her back which prevents her from stooping, bending and lifting heavy things. She also complained of a stiff neck and the fact that her right leg had a tendency to relax and “give way”.
Dr. Julius Levy, the treating physician, examined plaintiff at the hospital the day after the accident. He found multiple abrasions and contusions of the back, neck, and extremities and she was in severe pain emanating principally from the back and neck. His diagnosis based on x-rays and examination was compression fractures of the first and third lumbar vertebrae (the latter being much more extensive), a lum-bo-sacral fracture of the vertebra, and a cervical neck strain. Dr. Levy stated that *637 after healing these fractures are not normal in length and angulation. She has lost the normal curvature of her spine in two directions and mobility of the spinal column is abnormal, resulting in a decrease in range of motion. Because of the bowing of the back there will be narrowing of the foramina where the nerve specifically exists. Due to this narrowing there has been pressure on nerves leaving the spinal cord and hence loss of function of the right leg due to nerve pressure. When last seen on October 4, 1967 his positive findings included not only bowing of the spinal común, noted on multiple previous occasions, but also a diminished knee jerk reflex in the right leg. In addition the right thigh measured one-half inch smaller than the left and the right calf measured three-fourths inch smaller than the left. This is typical of muscle atrophy or muscle shrinkage, in her case due to nerve pressure or disuse. Her complaint of weakness was due to the decrease in muscle size, a decrease in neurological function to the leg. The doctor found evidence of spotty anesthesia of various skin areas on the right side. This points to pain impulses. They are not mediated properly. The areas where these occurred are serviced by nerves from the upper lumbar spine. These are serious from a medical standpoint in that she will always have some incapacitation of her right leg and muscle shrinkage. As regards the fractures themselves, plaintiff will always have disfunction of the back and will be unable to carry on many normal activities because of the fractures, the loss of curve, and wearing down of zygapophyseal. If she attempts to do any work requiring bending, stooping or sitting for long periods pain will likely be manifested because of pressure on the nerves.
With the exception of the treating physician, Dr. Julius Levy, plaintiff was seen by each of the medical experts on only one occasion. All three agreed with the findings of the treating physician.
Dr. R. W. Levy’s x-rays showed a fracture of the upper front portion of the body at the first lumbar vertebra and a severe compression fracture of the entire body of the third lumbar vertebra in which the height of the vertebra is reduced to about 50-60% of normal. His x-rays were made on December 14, 1966. He examined previous x-rays. The bone is no longer roughly 1% inches high but is now about inch. He stated nothing could be done to re-expand the fracture to give plaintiff vertebrae of normal height so that the deformity which occurs either stays the same or becomes worse over a person’s lifetime. He likewise found the left calf was yii inch greater in circumference than the right calf. This could indicate atrophy of the right calf.
Dr. Richardson saw plaintiff on October 25, 1967. At that time plaintiff had two-thirds normal range of motion in the back. There was slight atrophy of the right calf. He considered this significant from a neurological standpoint to the extent that in his opinion her difficulty with the leg resulted in a 10% disability to the body as a whole, without reference to orthopedic problems in the spine itself.
Dr. Soboloff saw plaintiff on March 6, 1967. His x-rays revealed the joint spaces at L 2-L 3 were narrowed, presumably the result of post traumatic degenerative arthro-sis. It is not unusual to find this deterioration of the joint spaces in a serious fracture of this type. He felt the fracture had healed as of the date of his examination but that plaintiff’s complaints on bending, stooping and sitting for long periods were compatable with his examination and the x-rays and that her residual difficulties would be a problem for the remainder of her life.
With regard to quantum we have examined other cases involving somewhat similar injuries. These cases include: Gaspard v. LeMaire, 245 La. 239, 158 So.2d 149; Marcus v. Kansas City Southern Railroad Company, La.App., 204 So.2d 676; Perry v. Baltimore Contractors, Inc., La.App., 202 So.2d 694; Paine v. Netherton Company, La.App., 191 So.2d 686; Mathews v. Em *638 ployers Mutual Fire Ins. Co. of Wis., 180 So.2d 38; Schaubhut v. Liberty Mutual Insurance Company, La.App., 157 So.2d 346; Levert v. Travelers Indemnity Company, La.App., 140 So.2d 811; Marcantel v. Southern Farm Bureau Casualty Ins. Co., La.App., 102 So.2d 879; LeBourgeois v. Indiana Lumbermens Mutual Ins. Co., 101 So.2d 720; Girouard v. Houston Fire & Casualty Ins. Co., 85 So.2d 664.
From our review of the entire record, particularly the medical testimony, and the jurisprudence we conclude that $20,000 will be a proper award to compensate plaintiff for the pain and suffering, past and future, and the residual disabilities resulting from her injuries.
We find that, with one exception, plaintiff’s claim for loss of wages has not been established with sufficient certainty. She is entitled to be compensated for loss of wages at $50 per week for sixteen weeks following the date of the accident during which time she was completely incapacitated, a total of $800 for this item. At the end of that time she returned to her former position at the same salary she had been receiving prior to the accident. Although she testified another person was hired to help her three days per week, she also testified the helper was paid at first by her employer’s wife and later by herself. We are unable to make any award in connection with this helper in view of the fact that there is no testimony as to when plaintiff started making payments, how long any such payments were made, or how long the helper’s services will be necessary.
Nor is there sufficient proof to justify an award for wages lost as a result of no longer being able to work part-time in her employer’s sportswear business. She did earn $576 in this work during the period from January 8, 1966 to the date of the accident, October 16, 1966. However, she was used by her employer in his business only when needed during peak periods and the record is devoid of any evidence as to the number of such periods, whether they occur regularly, and whether or not plaintiff’s services were required in the business after the accident or would with sufficient certainty be required in the future.
In addition to the item of $800 for loss of wages, the only proven special damages contained in the record are Dr. Julius Levy’s bill for $335 and a Touro Hospital bill of $384.40. Accordingly, the award for special damages will be in the total sum of $1,519.40.
For the reasons assigned, the judgment appealed from is reversed and it is now ordered, adjudged and decreed that there be judgment in favor of the plaintiff, Eula Mae Johnson, and against the defendant, Phoenix Assurance Company of New York, in the full sum of $21,519.40, together with legal interest thereon from date of judicial demand until paid; all costs to be paid by the defendant, Phoenix Assurance Company of New York.
Reversed.