TALIAFERRO, Judge.
Plaintiff sued to recover damages allegedly due her because of injuries sustained while riding in a taxicab of defendant, William L. Ryder, as a fare-paying passenger. The Tri-State Insurance Company, carrier of public liability insurance on the taxicab, was also impleaded as a defendant.
The accident alleged upon occurred at or about the hour of 8:00 o’clock the morning of April 17, 19S0, on Main Street in the Town of Pineville, Louisiana, just north of the suspended semaphore traffic light at the intersection of Harrison and Main Streets.
At plaintiff’s request the taxicab driver, one Lawrence Singleton, picked her up at her residence in Pineville, and he was directed to drive over Red River and into the City of Alexandria where she was employed as instructor in a beauticians’ training school.
Main Street is the principal traffic artery in Pineville, being a part of the State highway that connects Alexandria and Monroe, and carries very heavy motor vehicular traffic at and about the -hour the accident occurred.
At the time of the accident thg taxicab formed a link in a long procession of motor vehicles moving slowly southerly. It was immediately preceded by a passenger car driven by Dr. O. B. Owens, who also resides in Pineville. At the taxicab’s rear was a truck in which three Negro boys' were riding, two of them being Bill and Birl Frazier.
When the mentioned traffic light displayed red, traffic above it, of course, immediately halted.
Plaintiff alleged that when the car ahead of the taxicab stopped at the traffic light, the taxicab did not do so, but ran into the forward car, following which instantly the truck ran into the taxicab, and that “the violent impact of these two collisions threw your petitioner from the rear seat of said taxicab to her knees on the floor, and caused the injuries hereinafter set forth.”
She alleged that the proximate cause of the accident was the negligence of the driver of the taxicab, his lack of care and skill, coupled with defective condition of the vehicle. Amplifying- these general allegations, she further set forth that the negligence, etc., consisted of:
Failure of the taxicab driver to keep a proper lookout ahead of him; failure to stop the vehicle before colliding with the car ahead of him; not giving proper hand signal prior to coming to a sudden stop; operating the vehicle with defective 'brakes; absence of adequate rear (tail) lights, designed when the brakes are applied, to apprise motorists behind of his intention to stop.
The elements of damages sought are:
Medical and hospital expenses, physicians’ bills, physical and mental pain and suffering, present and future loss of earnings and earning power.
Defendants firstly tendered exceptions of no cause and no right of action which were overruled. They are not urged here. They deny any negligence on the part of the taxicab driver as a cause or contributing cause of the accident, and deny that the taxicab collided with the car ahead of it. They affirm that the truck driven by Bill Frazier ran into the taxicab after it came to stop in a normal manner in the face of'the red light, and to Frazier’s negligence, in this respect, is the accident solely due. In all other respects the allegations relied upon by plaintiff for recovery are denied; and it is alleged that in event of recovery herein, the insurer’s responsibility cannot exceed Five Thousand ($5,000.00) Dollars, the limit of liability fixed by the policy.
*318 Plaintiff’s demand was rejected and her suit dismissed. She appealed to this Court.
Plaintiff testified that she was sitting aibout the middle of the rear seat of the taxicab, and that when the cars ahead suddenly stopped on the red signal light, the taxicab ran into the Owens car and in an instant the truck ran into the rear of the taxicab. She says the impact of the first collision threw her forward against the back of the front seat with knees upon the floor and as she endeavored to arise and regain the seat the second collision occurred. The two Frazier boys corroborated her testimony in regard to the order of the collisions.
The taxicab driver testified that the truck first ran into the taxi, and that the impact was sufficient to drive the taxicab into Dr. Owens’ car. Dr. Owens testified that the taxicab was run into by the truck after it stopped, but denies that the taxicab ran into his car. He added, however, that possibly the bumpers may have contacted, but without the force of a blow. He also added that when the taxicab stopped it was only one or two feet from his rear bumper. How he knew this is not made entirely dear, as he was at the time on the front seat of his own car watching traffic ahead. If the vehicles had .been this short distance apart, surely the force of the collision by the truck would have forced the taxicab against the rear of the Owens car.
Dr. Owens further testified that notwithstanding he was awaiting favorable traffic light, and that his own car was not even jarred by the accident, but having heard a noise from the impact between the taxicab and the truck, he at once got out of his car and walked back to learn if anyone was hurt. He observed plaintiff sitting in the taxicab “obviously uninjured”, and the unhurt Negro boys; and being certain none of them needed the attention of a doctor, he returned to his own car and drove away. However, he did not ask any of them if they were injured.
Singleton, the taxicab driver, flatly contradicted Dr. Owens’ testimony in material respects. He testified that after the bumpers of the taxicab and the doctor’s car contacted rather violently, the doctor alighted, walked back to the rear of his own car, looked the situation over, and said: “No damage done to me; hope there isn’t to you folks”. He further said: “He gets into his own car and goes on.” In this connection, it is pertinent to inquire: Why did the doctor get out of his car ? The answer appears clear. If the taxicab did not ram his ■car, as he says, why get out to see if any damage was done to his car? Singleton’s testimony definitely answers these questions. Again he contradicts the doctor when he says that after learning that his own car had not been damaged, he turned around, got in.it and drove off. That certainly means that he did not go on down the line to ascertain who, if any one, was injured.
It may be stated that as a fixed rule, a motorist in a long procession of cars, awaiting a green traffic light does not further contribute to the jam of traffic by leaving his own car at stop and going down the line to ascertain who has been injured or damaged in a minor collision in which his own car has had no part.
The taxicab driver drove on into Alexandria and plaintiff got out. But before driving from the scene of the accident, he told the Negro boys to drive to the cab stand of his employer in Alexandria and they did so. There, it was determined that the only injury to the taxicab consisted of a bracket from the rear bumper being knocked off. Bill Frazier paid for this damage, being two dollars. This fact is pointed to as strong evidence of a sense of responsibility by this boy for the accident. We think his explanation as to why he made this small payment dispels any inference of guilt on his part. He is a Negro and was dealing with white men. He says he made the payment simply to put an end to the controversy, and at the suggestion of a policeman who was present. Such action on the part of any boy would certainly be natural under the circumstances.
The probative worth of the testimony of the Negro boys is assailed rather vigorously by counsel of the defendants. It is pointed to as being singular that Bill Frazier was not sued. In view of the *319 facts, this does not appear to us as •being' strange. His financial responsibility is not shown but we opine it to be nil. He and his brother owned the truck but it had not been paid for. Neither of these boys has anything to gain or lose from the outcome of this case. Officers who investigated the accident preferred no charges against either. On the whole, their testimony appears to be free from any appearance indicative of a purpose to favor one side over the other. Their testimony, augmented by that of the plaintiff, certainly makes out a strong case of negligence against the taxicab driver.
The testimony of Dr. Owens, in many respects, is the most unusual we have ever been called upon to consider.
Plaintiff’s counsel interviewed the doctor within sixty (60) days after the accident, and he positively denied any knowledge of or part in an accident at the time and place alleged upon. He stated that he, on April 17, 1950, was absent from home in attendance upon some convention of doctors. The attorney related some of the material facts of the accident, yet the doctor’s mind remained wholly blank. He is only fifty (50) years of age. The counsel asked him if there was another Dr. Owens in Pineville, and was told that there was one connected with the Veterans’ Hospital. He thought possibly he was interviewing the wrong Dr. Owens. We quote the following from Dr. Owens’ testimony:
“Q. Can you tell the Court, Dr. Owens, how your memory at this time, one year and some months later, should be so vivid of the accident when at the time I called on you after we went into it and I spent some time, you couldn’t even remember the occurrence of it? A. I became concerned about it as a result of your visit to me and the first thing I did was to check the date to see if I was in town or out of town on that date and I realized that I was in town.. The chain of events gradually came back into my mind which caused me to recall the accident that had occurred that morn- • ing, but at the time you were in my office, I recall now you being there, and my total inability to identify myself with an accident being under the impression I was out of town at that time — very distinctly do I recall.
“Q. You also very distinctly recall I asked you if you remembered any such accident where a City Cab was involved? A. Yes, I recall the conversation and my denial of any knowledge of it at that time, which I may add is not unusual for my memory.”
It appears that after the “chain of events” was revived in the doctor’s mind, he provided defendants’ counsel with written statement covering the recalled facts, but did not provide plaintiff’s counsel therewith, nor inform him that his former denial of being involved in the accident was unfounded. He also testified:
“Q. Dr. Owens, after you recalled the accident, which is the subject of this law suit, you had no trouble then recalling the facts you testified to on direct examination ? A. I had no difficulty whatever in recalling it as vividly as if it were a picture that I had been looking at. If I may add the additional statement, I have been told that that type of mentality is termed a photographic mind and that I seem to have such a type of memory that I may recall a •considerable chain of events in detail or the writings upon an entire page from a book, in detail.”
It is also worthy of note that after the facts of the accident were recalled, they were retained in all their clarity until the day of trial, fourteen months thereafter.
It is worthy of note that plaintiff was thrown forward by the first impact. This indicates, at least, that the momentum of the taxicab had stopped before it was rammed from behind. Had the taxicab been first rammed by the truck, it is unlikely plaintiff would have gone forward as she did.
After careful study of the testimony, we have reached the conclusion that it was necessary for the three vehicles to be stopped suddenly, if at all, after the traffic light turned red. Dr. Owens succeeded in stopping his car before running into the car ahead of him, but the other two drivers did not fully do so. Dr. Owens testified that the taxicab was run *320 ning close to him as they traveled, ranging from six (6) to twelve (12) feet, which, under the circumstances, was too' close. The truck was running at a greater distance behind the taxicab.
We are also of the opinion that the testimony, as a whole, preponderates in favor of the contention that the taxicab ran into the Owens car before it was run into by the truck. It is not necessary to make a finding on the point, but even if the truck first ran into the taxicab at a time it was so close to the Owens car that it could not be stopped before ramming it, we are not prepared to say that the injury to plaintiff could not be properly charged to the joint negligence of the two drivers.
The strictness of the law with respect to the duty and responsibility of persons who transport passengers for hire is too1 well known and established to necessitate citation of authorities to support it. When a fare-paying passenger proves his status as such, and that he was injured by accident in or on the vehicle in use, he makes out a strong prima facie case and should recover, unless the carrier adduces evidence of a character of sufficient weight to clearly overcome the prima facie case. See Wallace v. Shreveport Railways Company, La.App., 175 So. 86.
The situation that confronted the taxicab driver as he moved in the caravan of cars was such as to require of him the utmost alertness and care. He should have kept prepared for sudden stop of other cars and other ordinary traffic hazards. Obviously, he did not do so, and his failure in this respect clearly amounts to negligence. See: LSA-RS, 32:234; Gandy v. Arrant, La.App., 50 So.2d 676; Overstreet v. Ober, 14 La.App. 633, 130 So. 648; McDaniel v. Capitol Transport Company, Inc., La.App., 35 So.2d 38; Vienne v. Chalona, La.App., 28 So.2d 154.
Plaintiff did not make an outcry when she fell from the seat of the taxicab, but says she was very much frightened and that her uneasiness was increased when the taxicab lightly bumped another car while crossing the bridge into Alexandria. Because of her failure to outcry or complain, it is argued that she was not injured. On this score Singleton gave some significant testimony:
“Q. You didn’t say a word to each other? A. Well, she said looks like every time she got in a car she got hurt, or something like that. She was merely talking to herself. She wasn’t exactly talking to me. She said very few words going on in.
“Q. She remarked that nearly every time she got in a car she got hurt? A. Yes, sir.”
The testimony of the physicians throws light upon this subject. They say many persons do not experience severe pain from an injury of the kind immediately after it happens. Plaintiff did testify that after alighting from the taxicab she felt serious pain in her back and leg, and thought she would be unable to walk to her place of employment. However, she did so, but had to call for assistance to negotiate the flight of stairs from the ground floor to the second floor where she worked. Two of her students had to give her strong assistance to do this. The serious nature of her pains and suffering was manifest to those about her. She was unable to efficiently perform her work and endeavored to get in touch with Dr. Rand, her family physician, that day, but failed. She returned to work the next day, but the persistance of the pains again prevented her from "performing her duties. Again she called Dr. Rand and this time he was in his office. After telling him briefly her symptoms and the cause, he told her to hurry over to his office next morning, and she did. The doctor administered conservative treatment in the hope that, as is true of many back pains, they would soon pass away, but this did not happen. He treated her for some time but without relief. She was then referred to an orthopedic surgeon who, in turn, advised her to see Dr. Dean Echols, of New Orleans, who is head of the Department of Neurosurgery of the Ochsner Clinic there. She did so in October, 1950. Dr. Echols diagnosed the ailment as being rupture of the fifth lumbar intervertebral disc. It so happened that in March, 1944, Dr. Echols operated on plaintiff for the same sort of injury to the same disc, but she had completely recovered from the operation *321 and its effects long before the second injury occurred.
Dr. Echols testified that the pain was caused from a piece of the disc having broken loose, forcing its way into the canal and against the nerve. In the instant case he performed the same sort of operation as was firstly performed, and in addition severed the injured nerve “as a guarantee against recurrence of the leg pain”. He found the adjacent disc normal. On account of marked weakness of the ankle, plaintiff was advised to wear a brace on her shoe until strength was recovered. She did so.
In view of the fact that it required about one year for plaintiff to recover from the first injury and operation so that she could resume her regular work, Dr. Echols was of the opinion that that time would be sufficient for her to recover in the present instance. Dr. Rand thought it- would require more time, but would not venture a guess as to how long. Dr. Echols testified: “I expect Mrs. 'Chisholm to malee a hundred per cent recovery from- the low back pain, and left leg pain; but anticipate a possible 5 or 10% permanent disability due to weakness of the ankle.”
At the day of trial, June 27, 1951, plaintiff was not able to do her regular work, nor any other work of a remunerative character. At that time she was still under Dr. Rand’s treatment. It may require another operation tQ attain one hundred per cent (100%) cure. She is thirty-nine (39) years old, and a widow.
It cannot be well questioned that plaintiff has suffered continuously pain and discomfort to a greater or less degree since the date of the accident.
Plaintiff has paid or is obligated to pay medical, hospital and physicians’ bills for expenses incurred to relieve her condition, the admitted sum of Nine Hundred Ninety-Seven and 10/100 ($997.10) Dollars.
Accepting Dr. Echols’ opinion, she should have recovered her ability to work by October 26, 1951, or practically eighteen (18) months from the date of the accident, for-which she . is entitled to recover Three , Thousand One Hundred Twenty and-No/100 ($3,120.00)' Dollars, being for seventy-eight (78) weeks at Forty ($40.00) Dollars .per week, being her admitted income.
For pain, suffering and discomfort we believe Four Thousand ($4,000.00) Dollars adequate. The insurer is not liable for any amount in excess of Five Thousand ($5,000.00) Dollars.
For the reasons herein assigned, the judgment from which appealed is annulled, avoided and reversed, and there is now judgment in favor of the plaintiff, Mrs. Pearl Chisholm and against the defendants, William L. Ryder and the Tri-State Insurance Company, in solido, in the sum of Five Thousand ($5,000.00) Dollars, and judgment against William L. Ryder, individually, in favor of plaintiff for the sum of Three Thousand, One Hundred Seventeen and 10/100 ($3,117.10) Dollars, with legal interest on both judgments from judicial demand until paid, and for all costs.
KENNON, J., not participating.