119 So.2d 566 (1960)
Marvin PICKETT et al., Plaintiffs-Appellees,
v.
NORWICH UNION FIRE INSURANCE SOCIETY, Limited, Defendant-Appellant.
No. 4957.
Court of Appeal of Louisiana, First Circuit.
March 21, 1960.
Rehearing Denied April 25, 1960.
*567 Bienvenu & Culver, H. F. Foster, III, New Orleans, for appellant.
Wm. T. Bennett, Clinton, Benton & Moseley, Baton Rouge, for appellees.
Before ELLIS, LOTTINGER, TATE, FRUGÉ, and LANDRY, JJ.
TATE, Judge.
On November 14, 1958, a collision occurred between vehicles driven by Marvin Pickett and David Armstead. This is a suit by Pickett and his passenger, Richard Westbrook, against Armstead's liability insurer to recover damages sustained by them as a result of the accident. The defendant insurer appeals from judgment in their favor in the amounts of $7,180, and $3,000, respectively.
The accident occurred at 5:30 P.M., when it was either almost dark or just after dark. Preceding the accident, both vehicles were approaching from opposite directions a T-intersection on Louisiana Highway 67, one mile south of Clinton, La., where the Bluff Creek Road joins the aforesaid highway from the east. Armstead, the defendant's insured, was driving southward from Clinton, following at a speed of 45 mph another vehicle by about three car-lengths. Plaintiff Pickett was proceeding northward towards the T-intersection at approximately the same speed. The headlights of both vehicles were on.
Conflicting versions of the ensuing accident are given by the two drivers involved, Armstead and Pickett. Armstead states that the southbound vehicle preceding him slowed as it approached the intersection, put on its blinker lights, and turned left (east) into the Bluff Creek Road suddenly across Pickett's path, which caused Pickett to swerve westward, to his own left, and into Armstead's Chevrolet, which at the time was stopped in its own lane. To the contrary, Pickett testified that the unknown vehicle preceding Armstead continued southward on Louisiana Highway 67, but that (after this unknown *568 forward vehicle had continued southward) Armstead suddenly turned left into Pickett's lane, and the vehicles collided"Just as soon as his [Armstead's] left front wheel got over the center of the highway, my left front wheel caught into it," Tr. 249.
These were the only two witnesses to the accident who testified. Under Armstead's version, he was free from fault (and consequently his insurer, the defendant-appellant herein, is free of liability) when Pickett suddenly turned left into Armstead's lane and hit the latter's Chevrolet; under Pickett's version, he himself was free from fault, and Armstead is entirely responsible for the accident caused when the latter turned suddenly into Pickett's immediate path and into the lane of traffic reserved for northbound traffic such as Pickett. It should be added that, since the road was muddy and other traffic had passed prior to the arrival of the investigating state trooper approximately twenty five minutes after the accident, there were no tire marks nor debris to indicate by physical evidence the spot of the impact. It is conceded, however, that, following the accident, the Armstead vehicle remained at an angle slightly across the center of the highway[1] and that the Pickett automobile veered to its right and stopped shortly after the impact 4-5 feet east of the highway and near the gasoline pumps of a gas station-tavern on the northeast corner of the T-intersection.
In resolving this diametrically opposed testimony, the trial court placed great reliance upon the testimony of the investigating state trooper. This officer testified positively that, when he arrived to investigate the accident, Armstead told him that the collision between his vehicle and Pickett's occurred when he, Armstead, attempted to make a left turn onto the Bluff Creek Road, and that he was struck when he was across the center line of the highway in the other vehicle's lane. Tr. 199-200, 203. The police officer also stated that Armstead had not told him at the scene of and immediately following the accident of a vehicle preceding Armstead's that had suddenly turned left across Pickett's path. Tr. 203.
The evaluation of the credibility of witnesses is a function of the trier of fact. Such evaluation should not be disturbed upon review in the absence of manifest error. We are unable to say that the trial court erred in accepting Pickett's version of the accident, somewhat corroborated as it was by Armstead's admissions immediately following the accident.
In urging that manifest error was committed, able counsel for the defendant-appellant particularly relies upon the physical results of the accident as reflected by four photographic exhibits of Pickett's Studebaker and Armstead's Chevrolet after these vehicles had been removed to a garage. (D-4 to D-7.) These photographs were admitted by stipulation and show that the left front of both vehicles had been damaged by the accident. While it is at least equally plausible that the respective damages to the vehicles could have resulted had the accident occurred if Armstead's version of the accident were instead correct, we are unable to say that the damage shown to Armstead's Chevrolet (D-4, D-5) could not have resulted when Armstead's left wheel turned suddenly just across into Pickett's lane and was struck just after the front left end of the car crossed the center line of the highway into Pickett's path as Pickett testified.
Counsel for appellant further contends that the testimony of Pickett is impeached by a statement he gave an insurance adjuster four days after the accident *569 in which he stated that the southbound car preceding Armstead had turned left and into the Bluff Creek Road when he, Pickett, was about one half block from the junction. Counsel also contends that the trial court erred in refusing to admit this document into evidence.
The circumstances surrounding execution of this statement, as brought out by the trial court's and counsel's interrogation of Pickett, were as follows: An adjuster approached Pickett at work and interrogated him for 1½ hours, left, returned the following evening to Pickett's lodgings at Baton Rouge with a paper which he said Pickett had to sign to be reimbursed for his car damage. Pickett signed it without reading it.
Based on Pickett's denial that he ever read over or knew what the contents of this statement were, and upon the failure of the defendant to produce the adjuster who had written the statement, the trial court held that the statement was inadmissible as unauthenticated (Tr. 249), although (as we appreciate its ruling) stated that counsel for appellant could question Pickett concerning the statement (Tr. 253). But assuming that counsel is correct in contending that the document was admissible in evidence upon Pickett's concession that he had indeed signed it (31 C.J.S. Evidence § 282, p. 1032), we do not believe that its admission into evidence impeaches Pickett's testimony or requires a holding that the trial court committed manifest error by its final decision. The version of the accident in Pickett's statement allegedly taken by the insurance adjuster four days after the accident is essentially the same as that to which he testified at the trial.[2]
Appellant also contends that an unfavorable inference should be drawn from a failure to testify on the part of Westbrook, the passenger in Pickett's car, who is also a coplaintiff in this suit. Under all the circumstances of this case, we do not see where such an unfavorable inference can be drawn; for as stated in Hardware Mut. Cas. Co. v. Schreiner, La.App., 82 So. 2d 861, at page 863, where similar contentions were rejected, "* * * a litigant is not under the obligation of producing all persons who may have knowledge as to the occurrence; all that is required of the litigant is that he produce sufficient evidence to prove his case by a preponderance of the evidence * * *".
Westbrook, by his written interrogatories taken at the request of the defendant-appellant and found in the record, had given the same version of the accident as that to which Pickett testified, although admittedly these written interrogatories were not specifically introduced in the evidence. With the preponderating testimony of Pickett as corroborated by Armstead's admissions to the police officer immediately following the accident, Pickett and Westbrook may well have felt that they had proved their case by a preponderance of the evidence. Had the defendant felt it was prejudiced by Westbrook's failure to take the stand, it had the right to call him under cross-examination, he being present in the courtroom during the entire trial, which lasted for two days from early in the morning until midnight.
Defendant-appellee further contends that the award for personal injuries to plaintiffs Pickett ($7,000) and Westbrook ($3,000) were excessive, and that the trial court's award of expert fees was excessive in amount. (Pickett's special damages were stipulated at $180, as Pickett did not pray for loss of earnings; although he introduced *570 evidence of the latter, to which objection was timely made.)
A. Pickett's personal injuries.
As a result of the head-on collision, Pickett's head and shoulder were thrown with sufficient force against the left door and ventilator to break the latter, his knee struck and bent the dashboard, and his chest struck and bent the steering wheel. He saw a doctor the next day and following and returned to his carpentering and worked for a week, but was in pain and, by his account, unable to perform most of the duties. Since then, he testified, he has been able to work only intermittently because of pain in his neck and left shoulder and because the use of his left arm was limited in raising and in lifting.
Testifying for him were: Dr. Hansen, a physician specializing in internal medicine and in the diagnosis and evaluation of diseases and abnormalities; Dr. Richard Means, an orthopedist; and Dr. A. G. Robert, a radiologist. The substance of their testimony is that as the result of the accident Pickett has sustained a disc injury or the aggravation of a pre-existing degenerative disc condition involving the cervical spine in the area of the 3rd, 4th, and 5th cervical intervertebral discs (which condition is corroborated by x-ray findings), with secondary effects on nerves and blood vessels in that area of the neck and leading into the head. As a result of these post-traumatic effects, there is a marked limitation of flexion in the neck, difficulty in raising the left arm above a certain level (due to a disturbance of the blood supply, corroborated objectively in Dr. Hansen's opinion by a weakening of the pulse upon attempting such motion), intermittently severe pain in the neck, and periodic severe headaches. These doctors found the condition to be disabling, although intermittently there would be relief from the disabling symptoms. Dr. Means felt that there was a 50% chance that the condition would cure itself without the intervention of serious and dangerous surgery; Dr. Hansen felt that there was little chance of such recovery.
The able counsel for the defendant relies upon the opinion of another orthopedist who at the date of his examination found no muscle spasm or pulse disturbance and who concluded that there was essentially no residual disability resulting from the accident. However, this physician admitted there was a restriction of motion of the neck, and he found narrowing of the intervertebral space between the 3rd, 4th, and 5th cervical discs, which he felt to be nontraumatic in origin and a likely explanation of the patient's complaints of pain and disability and of limitation of motion in his neck. (Morris, p. 11.) This specialist also admitted that a forceful collision, depending on the nature of the accident and its severity, could aggravate and increase the discomfort caused by these disc changes, which he felt to be non-traumatic in origin. (Morris, p. 29.)
Able counsel also contends that Dr. Means did not find Pickett to be disabled, since Dr. Means admitted that he would not have diagnosed an acute nerve irritation at the time of the accident had he understood the patient's history correctly. However, an examination of Dr. Means' subsequent testimony shows that, although his diagnosis of the cause of the disability initially following the accident might be changed, he nevertheless believed that Pickett was permanently disabled by a permanent disruption of the normal mechanics of the neck resulting from the accident (Tr. 106), and that the vertebrae changes were the result of the trauma (Tr. 111), and that the disability was precipitated by it (Tr. 100), as a result of which Pickett would have recurrent weaknesses (Tr. 105) and intermittent pain (Tr. 111) which would impair his efficiency and amount to a 20% total disability (Tr. 106), with a 50% chance of becoming worse so as to require serious surgery (Tr. 89).
We are unable to say that the award of $7,000 for Pickett's personal injuries is excessive, *571 and it will be affirmed. Marcantel v. Southern Farm Bureau Cas. Ins. Co., La.App. 1 Cir., 102 So.2d 879; Le Bourgeois v. Indiana Lumbermen's Mut. Ins. Co., La. App. 1 Cir., 101 So.2d 720; Merchant v. Montgomery Ward & Co., La.App. 1 Cir., 83 So.2d 920.
2. Westbrook's personal injuries.
The trial court awarded coplaintiff Westbrook the sum of $3,000 for his personal injuries. The evidence reveals that as a result of the accident Westbrook sustained a fracture of the upper left ribs and a mild to moderate neck sprain, as a result of which he suffered for over two weeks with severe pain and a marked limitation of motion in the left shoulder and neck, and he spit up blood for at least ten days after the accident. He was not confined to bed or placed in a cast. He was under a physician's care for approximately two and one-half months. Fortunately, his injuries cleared up without residual. In the light of other awards made for similar injuries, the trial award is somewhat excessive and will be reduced to $2,000. Camus v. Bienvenue, La.App. 1 Cir., 91 So.2d 99; Rhymes v. Guidry, La.App. 1 Cir., 84 So.2d 634.
3. Expert Witness Fees.
The defendant-appellant complains that the fees allowed by the trial court to the expert medical witnesses should be reduced as excessive. The doctors who testified at the trial of this and the companion Fisher case in Clinton were all from Baton Rouge, except for Dr. Beecham of Magnolia, Miss. As the Supreme Court noted in Succession of Moody, 229 La. 30, 85 So.2d 20, it is appropriate in fixing expert fees to take into consideration not only the time the experts are on the stand, but also the time they are required to take away from their regular duties to stand by near the courtroom to be ready to testify at the convenience of the court.
We have examined the complaint of the defendant-appellee with regard to each expert fee. We find, for instance, that the largest fees were set in the case of Doctor Cracraft ($300, taxed in the decree of the companion Fisher case, 119 So.2d 562), Dr. Hansen ($300, one-half taxed to the Pickett case, one-half to the Fisher case) and Dr. Means ($300, also taxed one-half in the Fisher case, and the remaining $150.00 in the present Pickett case); but that in each case, the expert medical witness was required to remain in or near the courtroom for between five and six hours, in addition to the time taken from his practice to proceed to Clinton and back. With the one exception to be noted below, we feel that these and the other expert witness fees were reasonable and were within the discretion of the trial court. As in Gillis v. Great Atlantic & Pacific Tea Co., 95 So.2d 186 (where we approved an expert medical witness fee of $350), we will not disturb the amounts fixed herein as expert fees by the trial court, under the circumstances reflected by this record where the medical experts were required to lose an exceptional amount of their time by their court appearances in these companion cases.
In the case of Dr. Chester Williams, however, who testified briefly and was released soon after the trial commenced, his fee was set at $250 in all ($150 in the Pickett-Westbrook case, where he testified for the latter very shortly, and $100 in the Fisher case), possibly through clerical error. This doctor testified that under the circumstances a $100 expert fee in all would be sufficient. (Tr. 67.) Accordingly, his fee will be reduced to a total of $100, one-half taxable to the present case, one-half taxable to the companion Fisher case, 119 So.2d 562.
Decree.
For the foregoing reasons, the award to the plaintiff Westbrook is reduced from $3,000 to $2,000, and the expert fee of Dr. Chester Williams is fixed at $50; and as thus amended, the judgment of the trial court is affirmed in all other respects.
Amended and affirmed.
NOTES
[1] Approximately four or five minutes later, another automobile driven by George Fisher collided with the Armstead vehicle as it lay across the highway. This second accident is the basis of another suit, which was consolidated with the present for trial and appeal. The decision of this companion suit is reported at Fisher v. Norwich Union Fire Insurance Society, Ltd., 119 So.2d 562.
[2] See Statement by Pickett dated November 18, 1958: "* * * A 1956 Chevrolet [Armstead's] was following close behind the car which turned left and the Chevrolet was either going very slow or was stopped. The next thing I knew the Chevrolet suddenly shot to its left in front of me and the left front end of my car hit the left front wheel of the Chevrolet. * * * I was in my proper lane at all times. * * *"