MILLER, Presiding Judge pro tem.
On June 14, 1958, the plaintiff, Mrs. Araminta B. Travis, was driving an automobile along Highway 38 in the Parish of St. Helena, when struck from the rear by an automobile driven by Jimmy Kent, and insured by defendant Norfolk and Dedham Mutual Fire Insurance Company. Mrs. Travis was accompanied at the time by her daughter, Barbara, and a negro child. The negligence.of Kent was at issue before the trial court, but is now conceded. Our review is therefore limited to the issue of quantum.
The trial judge awarded $500.00 to plaintiff, Huey M. Travis, as administrator of the estate of and for the use and benefit of his minor daughter, Barbara Dale Travis for her damages; $258.75 to Mr..Travis for $138.75 medical expenses incurred in the treatment, of his wife and daughter and $120.00 representing his loss of income resulting from the loss of use of his automobile while it was being repaired; and $7,500.00 to plaintiff Mrs. Araminta B. Travis for the physical pain, suffering, shock and mental anguish which she suffered as a result of this accident.
Mrs. Travis limited her description of the injuries suffered by her at the time of the accident to answering yes to the question “From the sudden impact were you stunned and didn't realize what happened ?” On June 19, 1958, Mrs. Travis consulted her family physician Dr. John I. Pike of Kentwood concerning her neck pains. Dr. Pike took x-rays which he interpreted himself and which have since been lost. According to his records, there was no evidence of fractures or dislocations and it was Dr. Pike’s diagnosis that Mrs. Travis suffered a wrenched or strained neck. During his testimony he graded this as a moderate whiplash. Dr. Pike prescribed codeine and cordex tablets on the first visit and administered diathermy, treatments on each of Mrs. Travis’ visits. She returned to his office on June 20th, 21st and 23rd, on July 10th, and 11th, on October 30th and on November 14th, 1958. On one occasion Dr. Pike ordered a refill of the prescription for cordex tablets. At no time did Dr. Pike recommend that Mrs. Travis remain in bed, nor did he prescribe traction or any type of neck brace or support. Dr. Pike was uncertain as to whether or not he had discharged Mrs. Travis, but she did not return for any further treatments connected with this accident. According to Dr. Pike “When last seen, she still complained of some soreness and discomfort in the posterior region of her neck, particularly on motion.”
On cross examination, Mrs. Travis testified:
“Q. Have you ever been in bed with the complaints you say you had ?
“A. I failed to get up in the morning.
“Q. Immediately after the accident did you spend any time in bed?
“A. No, I never stayed in bed a full day.
“Q. Always during that time you were carrying on your normal activities, keeping house?
“A. Yes.
“Q. Afterward you didn’t return to Dr. Pike. Have you ever been to any other doctor for treatment?
“A. I went to Dr. Hansen and a Dr. Smith in Baton Rouge.
“Q. You mean Robert and Geheber, the x-ray people?
“A. Yes.
“Q. You didn’t go for treatment?
“A. They didn’t recommend treatment. I asked them.
* * * * * *
' “Q. You were examined by Dr. Hanzen and Dr. Smith?
“A. Yes.
*655 “Q. Neither of them made any recommendation for treatment?
“A. No. I asked Dr. Smith if I should be treated, if there was a treatment that could help me and he said for as he knew there was not. He couldn’t recommend surgery, to wait a week. If I had pain get something to ease it. I asked him for my own benefit.
“Q. You have been taking aspirins and anacins for pain?
“A. Yes.
“Q. Do they relieve you?
“A. They did at one time but don’t any more. In fact I took so many aspirins I don’t take them any more.
“Q. Since this accident have you been gainfully employed outside your home?
“A. For two months.
“Q. For who?
“A. Wirebound Box in Rose-land.
“Q. In order to get that did you take a pre-medical employment test?
“A. Yes.
“Q. Did you pass it?
“A. Yes, I did but there was just not very much to it. I answered questions.
* * * 5|i * *
“Q. You are not under a doctor’s care at this time?
“A. No.
“Q. And you didn’t spend any time in bed except occasionally in the morning?
“A. When I fail to get up then I take it easy for a day or two and so far I have over come it.”
Only Dr. Pike was seen by Mrs. Travis for treatment. However, on March 5, 1959 she went to Dr. Lloyd A. Pye, an optometrist of Amite, Louisiana, because of her inability to do concentrated work at her job with the Roseland Wirebound Box Company. Dr. Pye did not prescribe glasses, but was of the opinion that Mrs. Travis was suffering very severe suppression. Dr. Pye described this condition as existing “when the individual attempts to see with both eyes and one fails to transmit impressions to the brain. The normal situation is a reciprocation or stimulation from both eyes. It is not a simultaneous pick up but a slight reciprocation of images by each eye. It is a definite transfer of images by one eye but the other eye is not performing.” Dr. Pye examined Mrs. Travis again on May 28, 1960, and found the same condition.
On cross-examination, Dr. Pye was asked:
“Q. What causes the condition you claim you found in Mrs. Travis’ eye?
“A. The causative factor is the one thing I cannot testify to. There are people who are disabled in this particular way from many other things than collision and the like. If a person is born with an injured eye and one whose refractive power differs from the other eye they will also have suppression. In this particular case I do not know what her condition was prior to this, 1959. I don’t know whether the lady enjoyed normal binocular vision — all I can testify is the condition I found then.
“Q. You wouldn’t say that was caused by accident?
“A. I would say it is one of the most outstanding symptoms found in the whiplash syndrome. A disturbance of binocular acuity.”
We know of no authority for the conclusion that a disturbance of binocular acuity is one of the most outstanding symp *656 toms fpund in the whiplash syndrome. Be that as it may, plaintiff has not proved the existence of the above set forth eye condition for the defendant placed in evidence the report of Dr. George Hebert Jones, M.D., an ophthamologist of Baton Rouge that:
“With the naked left eye she had a visual acuity of 20/20. With the naked right eye she had a visual acuity of 20/20. Examination both with and without medication disclosed small er-ro.? that required no glasses. There was a small mixed astigmatism in the right eye and small far sighted astigmatism in the left eye.
“The eyes moved normally; pupil-lary reflexes were normal; eyes were lined up properly; convergences and divergences were normal. There was no supression of either eye nor was there evidence that there had been supression.
“External and internal examination of the eyes were normal. In brief Mrs. Travis had normal eyes and there was no evidence of any problem due to or aggravated by the injury.”
We are constrained to accept the opinion of the ophthamologist rather than that of the optometrist.
Plaintiff’s counsel sent Mrs. Travis to Dr. Howard Hanson, general practitioner, for medical evaluation rather than for treatment. Dr. Hanson examined Mrs. Travis on December IS, 1959 and on May 19, 1960. This case was tried on November 18, 1960 and Dr. Hanson testified at' the trial.
It is evident that the trial judge was impressed with the testimony of Dr. Hanson, for his was the only medical testimony that would indicate that Mrs. Travis sustained a serious whiplash injury. However, in our view, the value of his testimony is greatly diminished in view of the following testimony given on cross-examination:
“Q. The last time you saw her did you feel she was capable of going about her normal duties that she would ordinarily attend to every day?
“A. If I had just examined her physically without taking her history I believe I would have presumed she would have been.”
Throughout his testimony it is obvious that Dr. Hanson placed a great deal of emphasis on the history given by Mrs. Travis. And the history related by Dr. Hanson indicates that Mrs. Travis has suffered a great deal more than did her history given at the trial. Dr. Hanson did not discover that Mrs. Travis had not sought any medical treatment for over one year prior to the examination, but instead presumed that Mrs. Travis was under the treatment of Dr. Pike. Neither did Dr. Hanson discover that Mrs. Travis has passed a physical examination and worked for two months for Wirebound Box. Dr. Hanson saw no need to refer Mrs. Travis to an orthopedic surgeon or to any other doctor and testified that “I don’t know (how) to cure (her) and don’t know how any other doctor could cure this condition she has, and I didn’t advise her to go to anybody unless she was hurting.”
While we attach little significance to Dr. Hansen’s conclusions based on the history of Mrs. Travis, which history was not established by Mrs. Travis at the trial, we cannot disregard that portion of Dr. Hansen’s testimony based on x-ray examination performed by Dr. A. G. Robert, Radiologist of Baton Rouge. In Dr. Robert’s report of May 19, 1960, he stated :
“SUMMARY: Degenerative or os-teoarthritic lipping, cervical spine, localizing to the fourth and fifth inter-space levels, but predominent at the level of the fifth where, in addition, there is a minimal osseous impingement upon the peripheral margin of the fifth intervertebral neural foramen on the right side. A loss of the normal lordotic curve to the lower cervical spine *657 with a minimal tendency to reversal at the fifth interspace level and a minimal limitation of flexion of the lower cervical spine are associated, but no loss of interspace width is identified.
“The appearance of the cervical spine is identical to that described at the time of an earlier examination obtained 12-15-59.”
In this connection, Dr. Hansen testified “The x-rays reveal degenerative changes in the cervical spine that I would not expect normally in a woman of 35 years of age.”
Dr. Hansen testified “ * * * I believe the loss of normal lordotic curvature and reversal of the curve at the fifth cervical interspace indicate that there is significant residual post traumatic injury to her neck. She most likely has post-traumatic degenerative arthritis of the neck and she could have herniation of one or more intervete-bral discs. * * * ”
While we cannot find that the record bears out the suggestion by Dr. Hansen that Mrs. Travis might have herniation of one or more intervertebral discs, the record leads us to conclude that Mrs. Travis “most likely has post-traumatic degenerative arthritis of the neck.” In so concluding we have given the plaintiff the benefit of the presumption which arises by virtue of the fact that the defendant had Mrs. Travis examined by Dr. Smith, orthopedic surgeon of Baton Rouge, and elected not to take his testimony.
Plaintiff suggests that this court should be guided in setting Mrs. Travis’ damages by the awards made in the cases of Chisholm v. Ryder, La.App., 56 So.2d 316, Merchant v. Montgomery Ward & Co., La.App., 83 So.2d 920, LeBourgeois v. Indiana Lumbermens Mutual Insurance Co., La.App., 101 So.2d 720, Marcantel v. Southern Farm Bureau Casualty Insurance Co., La.App., 102 So.2d 879, and Pickett v. Norwich Union Fire Insurance Society, La.App., 119 So.2d 566. These cases were concerned with much more serious injuries than those presented by Mrs. Travis.
We find the cases of Marchiafava v. Pearce, La.App., 125 So.2d 34, and Attaya v. Zimmerle, La.App., 83 So.2d 676, somewhat in line with the facts of this case. In both of these cases, this court awarded damages of $2,500.00. In the Marchiafava case, the plaintiff remained in bed for almost two months, and could not work for-six months thereafter. While Mrs. Travis, has not been disabled to this extent, we believe that the residual post traumatic injury to her neck revealed by the degenerative osteo-arthritis localized primarily to the-level of the fifth cervical intervertebral space posterially, approaches the overall disability found in the Marchiafava case. Accordingly, we are of the opinion that the award by the trial court of $7,500.00 was. excessive and should be reduced to the sum of $2,000.00.
Mrs. Travis described the injury to. her young daughter Barbara Travis, as follows :
“Q. What happened to her?
“A. Apparently nothing at the time but along the middle of the week, I say-Wednesday, she took a nap in the afternoon and when she woke up was. crying her her back hurting and I put. her in a tub and bathed her, she could' hardly stand, and took her to Dr. Pike- and he examined her and said it could' have been possibly a deep bruise from the lick.”
Dr. Pike examined Barbara on June 20th. and made x-rays on the same day. His. diagnosis was muscle strain and he prescribed rest and cordex tablets. Although, he treated Barbara for other illnesses since the accident, the child was never returned' for further treatment in connection with the accident of June 14, 1958. There was no-other medical testimony concerning Barbara’s disability. Under these circumstances, we are of the opinion that the award of; *658 $500.00 is excessive and should be reduced to the sum of $100.00.
The trial court awarded Mrs. Travis, individually the following medical expenses :
Statement of Dr. Pike, for x-rays and treatment of Mrs. Travis— $48.75
Statement of Dr. Pike, for x-rays and treatment of Barbara— 30.00
Statement of Dr. Robert, for x-rays for diagnosis of Mrs. Travis — ■ 60.00
It was admitted that the x-ray examination by Dr. Robert was made solely for the benefit of Dr. Hansen whose examination was for the purpose of evaluating Mrs. Travis’ disability rather than for the purpose of treating the plaintiff. Medical expenses are allowed as items of damages when incurred for treatment, but when incurred for the sole purpose of evaluating the injuries of the plaintiff, these expenses cannot be recovered as damages. Therefore this $60.00 fee is disallowed.
Defendant complains of the trial judge’s award of $120.00 for the loss of income to Mr. Travis occasioned by the fact that his car was in the repair shop for three weeks. The record shows that Mr. Travis received approximately $40.00 to $50.00 per week for transporting fellow workers to and from work. Defendant does not contest this, but contends that the three weeks delay is excessive and unreasonable. Defendant contends that this extended delay was due to Mr. Travis insisting that his insurance company replace the damaged trunk lid of his new Buick with a new trunk lid. However, the record makes it clear that Mr. Travis never talked to any adjuster, and was satisfied by the warranty he received from Johnson Cefaul Buick of Amite that his car “would be fixed good as new.” The record does not disclose that the delay in having plaintiff’s car repaired was due to Mr. Travis’ fault. Therefore the trial judge’s award of $120.00 for this item is in order.
For these reasons, the judgment of the trial court is amended by decreasing the award to Mrs. Araminta B. Travis to $2,-000.00, by decreasing the award to Huey M. Travis, as administrator of the estate of and for the use and benefit of his minor daughter, Barbara Dale Travis, to $100.00, and by decreasing the award to Huey M. Travis, individually, to the sum of $198.75, and in all other respects the judgment is affirmed, defendants to pay the costs.
Amended and affirmed.